In this case, after hearing the evidence, the lower court rendered a written opinion rejecting plaintiff's demands. It is as follows:
"This is a case in which plaintiff sues for damages which she claims she suffered as the result of eating spoiled meat containing maggots which, it is alleged, she purchased from defendant.
"The Court has listened to the testimony of the various witnesses in the case which, briefly, is as follows: *Page 821 
"The first witness for plaintiff, a Mr. Talton, testified that he, at the time in question, was Night Superintendent of the Milner-Fuller Motor Company where the husband of plaintiff worked, and that on the night in question, the plaintiff's husband and plaintiff showed him a paper plate containing meat bones and some barbecue sauce — in other words, what was left of the barbecued meat — and that he saw maggots on the bones and on the plate. Two police officers called as witnesses for plaintiff testified that they were shown the plate, but they were not willing to swear that they saw any maggots. They said they saw nothing which they would call a live maggot. A young man attending school, by the name of Nettles, testified that he was shown the plate and bones and gravy and that he thought it had maggots in it. Dr. Johnson testified as a witness for plaintiff that he was called to wait upon plaintiff the day following the alleged eating of the meat and that she was suffering from food poisoning. The other two witnesses for plaintiff are the plaintiff and her husband.
"Plaintiff testified that her husband called up over the telephone and called the place of Joe Gonzales, the defendant, and ordered some barbecued pork; that the pork did not come right away and that she then called up the place, asking Information for the number of Joe Gonzales' place; that then a delivery boy arrived with the barbecued meat and that she and her husband sat in a car on the Milner-Fuller used-car lot, where he worked; that they proceeded to start eating the barbecued meat and after they had eaten nearly all of the meat, her husband went to get a bottled drink and bought her a Grapette; that when he returned, she felt something on her face and she removed it and found it was a worm — a maggot; that they then discovered several maggots on what was left of the meat and bones in the plate. They called up Joe Gonzales' place and reported to him that they had sent them spoiled meat and that whoever answered the phone spoke a few curse words and hung up the phone; that some time after that the delivery boy arrived and that he reported back to Gonzales' place that the meat was spoiled and then that the man who said he worked for Gonzales, that is, the witness in the case named Martinas, arrived; that he stated substantially he was sorry they had gotten hold of spoiled meat and hoped they wouldn't quit trading with them.
"Plaintiff then testified that they went to the Johnson Drug store, where she had the druggist give her some medicine to make her vomit; that he gave her some ipecac and she went home and, after taking three doses of this medicine, she vomited quite a while. She had her husband call the doctor but was unable to get him until the next day, when she got Dr. Johnson.
"At the time they got the meat and ate it, approximately around ten o'clock on Saturday night, but on the following Sunday that the witness Martinas came to her home, brought a dressed chicken and told her they were sorry it happened; that they were willing to pay her doctor's bill and do the right thing. Her husband testified to about the same state of facts. When the case was with the defendant, the defendant himself took the stand and testified that on the night in question he was personally on duty at his place of business and that no order was sent out from his place of business. He furthermore testified that it was a rule of his place of business that on Saturday nights no deliveries were made whatsoever, and that he had practiced that rule for sometime past. The witness Martinas testified that he was on duty working for the defendant, Joe Gonzales, on the night in question; that he did go to Milner-Fuller's, as the plaintiff testified, and that he did go to plaintiff's house the following day and that he did tell them that defendant would pay the doctor's bill and, in his own words, he said he did everything he could to try to get the plaintiff satisfied. He states that the plaintiff told him, and he was under the impression, they had come to the place of business and gotten the barbecued meat. He also testified that at that time they had made no deliveries on Saturday night and hadn't for a number of years, and that had he known that plaintiff claimed she had had the meat in question delivered to her, he would not have fooled with going to see plaintiff, but that he was under the impression she claimed to have come to defendant's place of business and gotten the meat there. He testified positively that no deliveries were made at that time. The next witness for the defendant, a man by the name of Childers, testified that he was a cook, working in the place of business of defendant on the night in question and that it was a rule that no *Page 822 
deliveries were made on Saturday night from defendant's place of business. These two witnesses are not employed by the defendant at this time.
"It was a strange coincidence, to say the least, that the witness Martinas, when he was attempting to pacify plaintiff on the night this case happened and on the Sunday following, should have been under the impression that the meat was bought and delivered at defendant's place of business, and that on the same Sunday, Dr. Johnson, who was called to the home of this plaintiff, should have gained the same impression that this plaintiff stated to him that she ate the meat in question in an automobile beside the Gonzales restaurant. Certainly there would be a coincidence if both of these witnesses, one for the plaintiff and one for defendant, on the day following the night that the meat was eaten, to jump to the conclusion from hearing plaintiff's statement of the case, unless the plaintiff had said in that statement that she had gotten and eaten the meat at the place of business of defendant.
"In the last analysis, plaintiff and her husband testified that the meat was ordered over the telephone from defendant and that later a delivery boy arrived with the meat. Against this testimony, you have the testimony of defendant's two other witnesses that on the Saturday night in question no orders were sent from this place of business to the plaintiff or to anybody else.
"The Court feels that this statement fully covers all of the testimony on both sides, and the Court therefore feels that the plaintiff has not made out a case as required by a preponderance of the testimony. For that reason, let there be judgment rejecting the demands of plaintiff at her costs."
On the application of plaintiff, a new trial was granted to allow additional evidence. After hearing the new evidence, the court rendered another written opinion again rejecting plaintiff's demands. It is as follows:
"In this case the Court has previously decided the case and granted a new trial for the benefit of hearing new testimony on the question as to whether or not the contaminated food which is claimed to have caused the injury was actually sold by defendant.
"In this new trial, the plaintiff offered testimony of a night watchman to the effect that he knew the boy who delivered the food and had often seen him prior thereto at the place of business of defendant; and that after delivering same he returned to the plaintiff and stated that defendant wanted him to send the food back and they would return the money.
"In the last analysis, there is no positive, direct testimony by any witness from their own knowledge that this food came from the place of business of the defendant. The testimony may be classed as circumstantial evidence, as the testimony of the boy who delivered the food is not in the record and the defendant and the employees that worked at his place of business on the night in question have vigorously denied that any delivery was ever made from that place of business. On the face of the record, one would naturally presume that the food was sent out by the defendant but the Court cannot jump at conclusions and, where circumstantial evidence is relied upon, the law is that you must not only show or prove the facts, but you must exclude any possibility of contrary facts.
"As stated, the Court might presume from the record that the defendant sold the food, but the law requires that a case be made out according to the rules of evidence, and the Court does not think, in the absence of any testimony positively showing that this food came from the restaurant of the defendant, that it would be justified in saying that the defendant and his former employees had deliberately perjured themselves in this case.
"For that reason there should be judgment in favor of defendant rejecting the demands of the plaintiff at her costs."
The case involves only factual issues and the credibility of witnesses. The lower court saw and heard the witnesses and is in a better position to pass on their credibility than we, and unless its judgment on this question is based upon facts which do not justify its conclusion, we should not disturb it. From a reading of the opinion of the lower court, it is apparent that it did not believe the testimony of plaintiff or her husband and there is nothing in the record which will justify us in upsetting its appraisal in that respect.
It therefore follows that the judgment of the lower court is affirmed with costs. *Page 823